IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-20014-13-KHV |
| | ) | 15-20006-01-JAR |
| PETSAMI PHOMMASENG, | ) | 15-20020-JAR |
| Defendant. | ) | |

DEFENDANT PHOMMASENG'S SENTENCING MEMORANDUM

COMES NOW the defendant, Petsami Phommaseng, by and through his attorney of record Jacquelyn E. Rokusek, and hereby states the following in support of a sentence that is sufficient, but not greater than necessary, to achieve the objectives of the Federal Sentencing Guidelines considering the factors set forth in 18 U.S.C. §3553(a).

The defendant is requesting a 120-month sentence based on: (1) his history and characteristics; (2) the government's reliance on "ghost dope" to support nearly all of the methamphetamine weight; and (3) the defendant's amenability to rehabilitation. The defendant's difficult upbringing and progressive addiction issues further support a downward variance under Title 18 U.S.C. §3553(a). A variance is a non-guidelines sentence based on the statutory sentencing factors. 18 U.S.C.A. § 3553(a); U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A. The defendant will address the issues most relevant under §3553(a).

1

THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Petsami Phommaseng was born into poverty in 1980. He lived in New Orleans, Louisiana in public housing for the first 10 years of his life. His family later moved to Alabama. Petsami's parents watched his struggle in both school and at home and eventually sent him to Olathe, Kansas when he was 15 years old. His parents could not control Petsami who was struggling with their poverty and the environment in which the family lived. Their plan quickly failed, however. Petsami, after only a couple of weeks at school, was shunned and teased by other students at Olathe North High School. He was an angry, poor, confused teenager living in Kansas.[1] He felt abandoned by his parents and disregarded by the educational system. He did not fit in with the other Johnson County students. He was ultimately expelled for lashing out at another student. The expulsion was the first of several experiences that resulted in the downward spiral which ultimately landed Petsami in federal court. Petsami, expelled from high school and merely a teenager, was forced to take a job as a busboy at a restaurant in Olathe at the Great Mall of the Great Plains. He also started smoking marijuana to self-medicate and suppress his emotions. In fact, Petsami started using alcohol, marijuana, cocaine and methamphetamine in his teenage years. Not surprisingly, his drug use has impaired his ability to gain and maintain employment. He was undereducated, essentially unemployable and feeling abandoned.

---

[1] Petsami Phommaseng has completed "Understanding and Reducing Angry Feelings" while incarcerated at CCA. See Attached Document #1

Petsami Phommaseng's employment opportunities had been stagnant. He still has few job skills. However, he did try to contribute to his family. Petsami is a husband and father. He has been in a common-law marriage with Susan Kahmpannha since 2005. They have four children and Petsami has another biological daughter who lives with her mother. Susan and Petsami's four children were cared for primarily by Petsami while Susan worked outside the home. Petsami would get the children ready for school each day. The children range in age from 2-15 years old. Although some individuals seem to believe that you could not possibly love your children if you involve yourself in criminal activity, that simply is not true. Petsami loves his children, but he suffered from uncontrollable addiction issues. He grieves the loss of the children every day. He has not had contact with his wife or children in over a year. Many tearful conversations have centered around his inherent loneliness and loss. He blames himself for his situation and takes full responsibility for his actions. Regardless of his lot in life, Petsami did attempt to contribute to the betterment of his family and he tried to supplement the family income. He simply never wanted his children to be raised in poverty and have the life experiences he had growing up.

Petsami attempted to earn money by working odd jobs. He particularly enjoys working on cars. As such, he regularly worked on cars in the family driveway to supplement the family income. He also liked to trade and sell electronic equipment on the internet. Even with Susan's income and Petsami's contributions, the family did not have sufficient financial resources to survive. The

3

family of six lived a simple life in a modest duplex in Lawrence, Kansas. Petsami drove a 1995 Cadillac. The family certainly did not live an extravagant life, as neither Petsami nor his wife earned enough money to adequately support the family.

One theme that was consistent throughout Petsami's life was his inability to deal with depression and stress. He would use drugs to mask the pain. Petsami lost his last mainstream job approximately 5 years prior to his arrest. He became depressed about his inability to support his family. His methamphetamine use increased significantly during this time. He became a daily user of methamphetamine. Petsami was also distributing methamphetamine. He was selling drugs so he could support his drug use and feed his family. It was a sad, lonely existence.

Petsami's extended period of sobriety has left him eager to seek drug treatment.[2] Petsami respectfully requests authorization to participate in the RDAP program within the Bureau of Prisons.[3] He recognized that the will not likely be awarded a reduction on his sentence for participating in the RDAP program, but he remains committed to his sobriety and believes that the program will provide him the tools to remain sober. It is notable that Petsami never used drugs at CCA even though the drugs were readily available. His sobriety was tested by certain guards and inmates, but he perserved.

---

[2] Petsami Phommaseng completed the "Twelve Step Support Group" course while incarcerated at CCA. See Attached Document #2.
[3] Petsami Phommaseng has successfully completed the "Getting Motivated to Change" program while incarcerated at CCA. See Attached Document #3.

4

The Court may not be fully aware of the extent of Petsami's addiction. He was in an actual methamphetamine-induced psychotic state when he was arrested and interviewed. Law enforcement officers described his condition as a "meth psychosis". He was hallucinating. He thought people were breaking into his home through a hole in the roof and painting his kitchen. He was convinced people were stealing clothes from his house. The information he conveyed to the officers made little sense as he was in a meth-induced psychotic state. Psychiatrists now recognize the link between methamphetamine use and psychosis.[4] Petsami's addiction was so far advanced that he was often not certain what was real and what was imagined. Even today, Petsami struggles to understand what was real and what was imagined during his meth-psychosis.

Thankfully, this issue can be rectified. Petsami has been sober since February 21, 2015. The fact that he has remained sober is notable considering the volume of drugs which were, according to the government, flowing freely through CCA. He could have used drugs, but he did not. In fact, he never wants to use drugs again. He wants a life with his family. He is embracing his sobriety.

Ultimately, the defendant entered a binding plea on all three of his federal cases. The Court must sentence the defendant to a number of months between 120-240 if the plea is accepted. Thus, a variance is not required to sentence the defendant to 120 months. However, it is notable that a variance would be warranted in this case. A variance based upon addiction-related issues is accepted

---

[4] McKetin R, Lubman DI, Baker AL, Dawe S, Ali RL. Dose-Related Psychotic Symptoms in Chronic Methamphetamine Users Evidence from a Prospective Longitudinal Study. *JAMA Psychiatry.* 2013;70(3):319-324. doi:10.1001/jamapsychiatry.2013.283

as an appropriate sentencing consideration in federal courts. In *United States v. Hendrickson*, 25 F.Supp. 3d 1156, 1171-72 (2014), the Court described how addiction relates to criminality, specifically how addiction is a disease affecting both the brain and behavior. Further, the Court acknowledged that drug addiction is a chronic and compulsive behavior, regardless of the harmful consequences which are likely to result from the drug use. Citing a 2012 study from *PsychCentral*, (Rick Nauert, *How Drugs Hijack Decision–Making in the Brain, PsychCentral* (Nov. 27, 2012)), the Court found, "A recent study suggests that drug abuse damages a person's orbitofrontal cortex (OFC)—the brain region responsible for evaluating hasty decisions—impairing the person's judgment, especially regarding a decision's long-term consequences." The Court in *Hendrickson*, without prompting from the parties, determined that a downward variance was warranted based on the defendant's addiction issues. A downward variance is also appropriate in this case. Petsami's addiction, coupled with the mere "user quantities" of meth with which he was found in possession of during each search, support the proposition that Petsami was not a ring leader, nor was he a kingpin. He was a drug mope, an addict…always looking for the next hit on his meth pipe and money to buy the meth. He made poor decisions, such as trading guns for drugs, no doubt about that. However, he is now committed to his sobriety and has long-term goals he plans to meet.

## INFORMATION RELIED UPON FOR RELEVANT CONDUCT

The defendant acknowledges that his base offense level is partially determined by drug quantity involved in the conspiracies, to include relevant conduct. The defendant understands that the Court can rely upon *credible* information provided by cooperating witnesses and co-defendants in determining the exact amount of relevant conduct, provided the evidence is proven by a preponderance of the evidence. The issue in this case is the reliance by the government on "ghost dope" to support almost all of the dope weight

There is obviously relevant conduct attributable to Petsami Phommaseng. However, the amount of relevant conduct (aka "ghost dope") relied upon by the government to request a 15-year drug sentence is disturbing. After spending hours of reviewing the multiple recordings and reports of the proffering co-defendants, it was noted that one cooperator finally admitted that she did not know how to quantify drug amounts and another was called a liar who would never be used for cooperation by the government. This illustrates the inherent problems when there is a significant reliance on relevant conduct to determine the appropriate sentence.

The government contends that caselaw supports the use of cooperating defendant's statements when determining the relevant conduct. The defense agrees. However, the Court should question whether it is acceptable to sentence someone to 20 years in prison when the basis for 10 years of that sentence is solely relevant conduct. The defendant admits to his criminal behavior. He admits to his role in the offense. He admits that he was an addict who distributed meth.

7

However, this is his *first felony offense*. This is the first time he will spend time in prison. The question becomes: Is a sentence of 5 years for the gun and 5 years for the drugs, run consecutively, sufficient, but not greater than necessary, to meet the objectives of the USSG and to protect the public? For this defendant, it is sufficient.

The Court should consider that law enforcement never found more than user amounts (never more than 3.5 grams) of methamphetamine when conducting those searches. Other items typically associated with someone dealing significant quantities of methamphetamine were also missing, to include large cash seizures, as were found in the Faustino Soto and Damon Griffin searches.

When sentencing a defendant involved in a conspiracy, the district court should start by making factual findings about how much of the conspiracy's criminal activity the defendant agreed to and could have reasonably foreseen. *See* U.S.S.G. § 1B1.3, cmt. n.3; *United States v. Green,* 175 F.3d 822, 837 (10th Cir.1999). The court must then calculate the defendant's base offense level and the advisory guidelines sentence based on that calculation. *See United States v. Figueroa–Labrada,* 720 F.3d 1258, 1267 (10th Cir. 2013). Finally, with the recommended guidelines' sentence in mind, the court may decide whether a variance is warranted to ensure a just sentence. *See Gall,* 552 U.S. at 49–50, 128 S.Ct. 586. Here, the Court must consider the USSG sentencing range prior to determining whether to impose the sentence recommended by the parties in the Rule 11(c)(1)(C) plea agreement. *See* USSG § 6B1.2(c). Thus, the Court must consider the applicable USSG sentencing range for each of the defendant's three

8

federal cases independent of one another. The Court must then determine whether the sentence recommended by the parties is within the USSG range or whether, if outside of that range, it is justifiable.  If the Court determines that the parties recommended sentence is appropriate, the Court must then determine what sentence is appropriate within the 120-240 month range on each.

The defendant did enter a plea of guilty to a gun count pursuant to 18 U.S.C. §924(c).  The Court has the discretion to consider the 60-month consecutive sentence in light of the sentence imposed on the other counts and reduce the sentence accordingly.  See *United States v. Dean,* USSC No. 15-9260 (2016). Specifically, the *Dean* Court held that, "Nothing in §924(c) restricts the authority conferred on sentencing courts by §3553(a) and the related provisions to consider a sentence imposed under §924(c) when calculating a just sentence for the predicate count." *Id*.  Thus, the Court can consider the sentence for the predicate offense in light of the fact that the predicate offense and the §924(c) counts shall run consecutive.  The defendant maintains that the parties contemplated a sentence of 120-240 months.  A sentence of 120 months is sufficient, but not greater than necessary, in this instance.  A 60-month sentence for both the gun count and the drugs, run consecutively, is 120 months.  The Court can consider the defendant's uncontrolled addiction to methamphetamine during the commission of the offense, his ability to remain sober during his time at CCA and the fact that almost all of the drug weight used to enhance the defendant's sentence is "ghost dope" as he was

9

never found in possession of even 4 grams of methamphetamine when searched by law enforcement.

Petsami Phommaseng accepts that he should be punished for his criminal behavior. He acknowledges that his addiction does not negate his criminal actions. He has forfeited at least a decade of his freedom and his life with his family due to his addiction and criminal actions. However, he should be sentenced as an individual who is being punished for the drugs and guns he is responsible for distributing and possessing during the conspiracy. A sentence of 60 months on the §924(c) counts, with a consecutive sentence of 60 months for the drug distribution, is sufficient, but not greater than necessary, considering the history and characteristics of this defendant, the facts of the three cases and the future dangerousness – or lack thereof – concerning this defendant.

Respectfully Submitted,

/s/*Jacquelyn E. Rokusek*
Jacquelyn E. Rokusek
Bar No. KS 16308
11658 W. 75th Street
Shawnee, Kansas  66214
Telephone: (913) 948-9311
FAX:  913.273.1890
Email: RokusekLawOffice@yahoo.com
**Attorney for Defendant**

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy via CM/ECF of the foregoing Memorandum upon all interested parties. Dated this 19th day of July, 2017.

/s/*Jacquelyn E. Rokusek*